[Cite as *Fitzgerald v. Fitzgerald*, 2016-Ohio-37.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

DANETTE FITZGERALD          :
         :
    Plaintiff-Appellant        :    C.A. CASE NO. 2015-CA-18
         :
v.         :    T.C. NO. 13DIV50
         :
DAVID FITZGERALD         :    (Civil appeal from Common
         :     Pleas Court, Domestic Relations)
    Defendant-Appellee        :
         :
         :

. . . . . . . . . . .

**O P I N I O N**

Rendered on the _____8th_____ day of _____January_____, 2016.

. . . . . . . . . . .

SCOTT D. RUDNICK, Atty, Reg. No. 0000853, 121 West Third Street, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellant

LINDA STEMMER, Atty. Reg. No. 0003647, 218 W. Pearl Street, P. O. Box 350, Union City, Indiana 47390
    Attorney for Defendant-Appellee

. . . . . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the Notice of Appeal of Danette

Fitzgerald, filed August 5, 2015. Danette appeals from the July 30, 2015 "Judgment Entry/Decree of Divorce" granted to her and David Fitzgerald. The record reflects that the parties were married on May 14, 1994, in Grant County, Kentucky, and that one child was born, on May 14, 1994, as issue of the marriage.

{¶ 2} Danette filed for divorce on January 30, 2013, and David filed an Answer and Counterclaim on March 27, 2013. Danette filed a "Reply to Counterclaim" on April 3, 2013. On May 27, 2014, "Plaintiff's Trial Memorandum" was filed, in which Danette argued that the "real estate of the parties located at 9877 Beam Road, Ansonia, Ohio, 45303, is a marital asset subject to division" by the court. On June 6, 2014 David filed "Defendant's Trial Brief."

{¶ 3} The Magistrate held a final hearing on May 27, 2014. At the start of the hearing, the parties agreed that Danette's responses to David's requests for admissions and the attached exhibits were to be adopted as findings of fact by the court. Danette testified that she and David separated on November 3, 2012. She stated that they acquired two rental properties during their marriage with a combined equity of $30,728. Danette testified that David and his three siblings, Anne, Ted and Donald, inherited property from their grandfather, located at 9877 Beam Road, in Ansonia ("the farm"), consisting of 107 acres, 95 of which are tillable. Danette stated that the farm is currently owned by David and his sister Anne, who purchased the inherited interests of the other two siblings. Danette's response to David's request for admissions reflects that pursuant to the siblings' agreement, "Donald and Ted each received $115,000 from [David] and Anne in exchange for their interest in the house, land and farm equipment." Danette testified that she, David, and Anne borrowed $160,000.00 in order to finance the

purchase, and she identified the note to Greenville Federal in that amount, dated February 17, 1996, signed by her, David and Anne, as well as the attached mortgage signed by David and Anne.

{¶ 4} Danette testified that she and David had a joint account at Second National Bank for personal expenses, a "farm account" at Greenville Federal, and a "rental account" at Greenville Federal for the rental properties. Danette testified that the monthly payment on the note was $1,064.49, and that the monthly payments were made "out of the farm account partially by the income off the land rental and the rest of my paychecks that were direct deposited to that account." Danette stated that the remaining portion of her paychecks went into their joint personal account as well as all of David's paychecks. Danette stated that Anne did not make any payments on the note. Danette identified a note for $25,000.00 to Greenville Federal from July, 2004, and she stated that she and David obtained the loan to pay off credit card debt. She also identified a note to Greenville Federal from December, 2006, for $7,000.00, and she testified that she and David obtained the loan to purchase a furnace for their home. Danette stated that the mortgages were paid from the farm account. She identified bank statements for the farm account from November 13, 2008 to October 13, 2012, as well as from July 13, 2001 to July 13, 2009. She stated that statements from June of 1996 to 2001 were at the marital residence and that David did not produce them as requested in discovery. Danette testified that she deposited money into the farm account during those years as well. She identified a summary of all the deposits that she made into the farm account in the course of the parties' marriage totaling $225,866.00 over 18 years. Danette identified a deposit agreement for the farm account which reflects that it was opened on February 27, 1996,

and that the signatories were she, David and Anne. It further reflects that Anne's name was removed from the account in December, 2010. Danette testified that Anne was removed from the account because she "lived in Cleveland. She couldn't run the day-to-day operations." Danette stated that Anne never wrote checks on the farm account or deposited any money therein.

{¶ 5} Danette stated that she cashed in a 401(k) from her employment with Darke County Child Enforcement in 2000 to "help pay expenses since I wasn't working at the time. To help cover expenses with the farm." Danette stated that she also cashed in a portion of her 401(k) from the Church of the Brethren in 2006 in the amount of "20 or 25,000 less taxes and penalty" to help with farm expenses, and that she does not have access to the remaining portion until she retires. Danette stated that David never told her that he considered the farm to be his separate property, and that if he had done so she would not have cashed in her retirement accounts. In addition to her retirement income, Danette testified that she provided physical labor on the farm during the marriage, including planting and harvesting crops, buying supplies, bookkeeping, paying bills and taxes, ordering and laying gravel, gardening, canning and freezing, taking care of livestock, building and maintaining a fence, cutting wood and trimming trees.

{¶ 6} Danette stated that the property was recently appraised at $1,000.000.00, and that it was appraised at $225,000.00 in David's grandfather's estate. She stated that she wished to maintain the rental properties. Regarding the farm, Danette testified that she calculated the marital interest therein by deducting the $225,000.00 in inherited value from the $1,000,000.00 appraised value, and then deducting a loan on the property in the amount of $100,500.00 at the time of separation, as well as a second mortgage in the

amount of $2,868.00, which has since been paid off. According to Danette, the remaining $671,632.00 is the marital interest subject to division. Danette stated she is entitled to half of that amount, or $335,816.00.

{¶ 7} The following exchange occurred in the course of Danette's cross-examination:

Q. In the Request for Admission [#44], you denied that there was inherited money used to pay - - pay for the interest of the siblings over and above the mortgage, approximately $70,000.

* * *

Q. Where did the money come from to pay the $225,000 to Don and Ted to satisfy their obligations, Number 44?

A. There were - - I believe, there were CDs and things that were cashed in that they got part of that in cash and then the rest of it we had to pay them.

Q. Okay. Anne and David got money from the estate and that - - from CDs and such to pay the difference between * * * the amount mortgaged and the $225,000 actually paid.

A. I believe so.

Q. Okay. That would be money that they inherited from their father - - or grandfather. From his grandfather.

A. Yes.

{¶ 8} In the course of his direct testimony, David stated that he is unemployed. He stated that he and Danette did not give Anne any money for her interest in the farm.

He stated that if the farm were sold, Anne would be entitled to her interest therein. David testified that he and Danette did not put any money into the house. According to David, they "basically replaced four windows to make an upstairs bedroom for one of the kids. And other than that, we haven't done a heck of a lot."

{¶ 9} The following exchange occurred:

BY MS. STEMMER:

Q. * * * - - you inherited approximately $70,000 that was used to pay in addition to the balance that was borrowed?

A. Um-hmm.

Q. Your answer's yes?

A. Yes. I know that we put inherited funds towards what we ended up settling up with my brothers for because 160 wasn't going to get it.

* * *

THE MAGISTRATE: Let me interrupt. * * * To go back to the $70,000 balance you were saying came from inherited funds. Do we have any money showing where money came from the estate and checks written to whom by whom? (sic) Is that all his, is that part Anne's? Is that part of the other four took - - part of the other two took part of their money? (sic)

MR. RUDNICK: Your estate. Your client.

MS. STEMMER: Do we have checks?

THE MAGISTRTE: I mean, I know there was a gross amount of the estate.

MS. STEMMER: Um-hmm.

THE MAGISTRATE: So we can figure out that divided by one-fourth. But from there on out, do we have any documentation of anything?

MR. RUDNICK: It all doesn't add up. We looked at it, and there's - - it doesn't – is that right? Is that fair?

MS. STEMMER: Yes.

MR. RUDNICK: The final account doesn't add up to how disbursements were made according to the family.

THE MAGISTRATE: And I'm supposed to figure this out how?

MR. RUDNICK: * * * From our standpoint, it's very simple. We're not asking for - - he got farm equipment, we're not asking for that. Money, we're not asking for that. Our standpoint is just the real estate. * * * I mean, they had a contract to buy out a family member. That's in the stipulation. * * * It's in the stipulations, and that's all we're claiming an interest in is the real estate - -

MS. STEMMER: It would be my belief - -

MR. RUDNICK: - - since it was purchased, not inherited.

MS. STEMMER: - - that the $70,000 was divided by Anne and David, half Anne's.

THE MAGISTRATE: So any of those CDs, the siblings got some more amount?

MS. STEMMER: Yes.

THE MAGISTRATE: Do we all agree then? So there was about $140,000 worth of CDs and stuff? Is that what you're saying?

MS. STEMMER: The request for admissions says that the total inventory is four hundred and some thousand dollars.

* * *

MS. STEMMER: And the agreement to purchase the interest of the two brothers is Exhibit A. And the amount reflected in that purchase is 225,000 and they borrowed the 160. * * *

THE MAGISTRATE: * * * So you're saying the $70,000 balance, you all agree 35 is Anne's and 35 is his?

MR. RUDNICK: I don't know that I agree with that, no. I'm not sure how it matters but I'm not - - I don't know - - I have not seen any proof of that, no. I mean, I don't mind if - - I've looked at the final accounts like Linda has and we both agree, I think, that they don't make a lot of sense in terms of what these folks say happened.

They weren't prepared very well, I guess, by the - - I'm not trying to throw anybody under the bus. They weren't prepared very well but personally I didn't worry too much about it because it seemed like the real estate was separate in terms of - - I don't know what they paid. So, no, I don't know that they each got anymore (sic) money.

THE MAGISTRATE: We all agree there is $70,000 more went to the two siblings than was borrowed to pay them off, right?

MR. RUDNICK: Do you understand that? Do you want to agree to that?

THE MAGISTRATE: 230 was the purchase price, correct?

MR. RUDNICK: I mean, I'll have to concede to my client on that, Your Honor. I'm not - - she may know. I don't want to answer for her. You understand the question?

MS. FITZGERALD: That they got more of the inheritance than just the 160 that we borrowed? Is that the question?

THE MAGISTRATE: Well, if the total property value, just the real estate was $230,000 right?

MS. STEMMER: 225.

MR. RUDNICK: 225.

THE MAGISTRATE: 225. Okay. So minus 160 which was the loan, I guess that makes it 65,000.

MR. RUDNICK: But we're taking off the whole 225, giving them credit for the full 225 in our analysis.

THE MAGISTRATE: Okay. We're agreeing that halfway down, half of the 225 is money that came from the - - that Anne's responsible for in one way or another. Either through the loan or through other money which somebody took from the estate. Am I making sense?

MR. RUDNICK: I'm a little confused. I'm not disagreeing with you. I'm more confused by the way you're analyzing it versus the way I analyzed it.

I just took, you know, the present value and took the whole estate, the inherited value, and figured that, you know, the difference would be depreciation and purchase.

THE MAGISTRATE: Well, then, what's the 70 you keep talking about?

MR. RUDNICK: I don't think it makes any difference myself but that's - - I don't know why she brought it up.

MS. STEMMER: It's the difference between the value - - it's five grand difference, but it's the difference between the value and the amount that was actually paid.

MR. RUDNICK: But if that was the case, then, in my analysis, we wouldn't be giving credit for 225. We'd be giving you credit for 160. I think I'm taking that 70 into consideration by giving them the credit for the full 225.

THE MAGISTRATE: I'm just trying to figure out from what I'm thinking is each of your approaches to it. You're looking at it as one thing, you're breaking it down.

MS. STEMMER: Yes, ma'am.

THE MAGISTRATE: Okay. Anyway you go about it, though, you all seem to say that half of it's Anne's.

MR. RUDNICK: Right now.

THE MAGISTRATE: Hmm?

MR. RUDNICK: At the moment.

THE MAGISTRATE: In the beginning.

MR. RUDNICK: In the beginning, she had a quarter.

THE MAGISTRATE: In the beginning, after they had ownership.

MR. RUDNICK: Yes.

THE MAGISTRATE:   Maybe in the middle was the best way to put that. * * *.

{¶ 10}   As to the farm account, David testified that there "were more checks written out of that account that weren't farm related than were farm related," including "all kinds of checks. Walmart, drugstore, doctors, medical bills, Eagles, American Legion, entertainment stuff.   It goes on and on." When asked if the proceeds from Danette's 401(k)s went into the farm account, David responded, "There's no way I could even comment."

{¶ 11} The following exchange occurred:

Q.   Basically, the farm has increased in value by about 700 plus thousand dollars.   To what do you attribute that appreciation?

* * *

A.   In my opinion - - first of all, they're not making anymore (sic) farm ground. Number two, the price of those commodities have gone up enough to where people can afford to pay more for land so they do.

BY MS. STEMMER:

Q.   So, to be more specific, you believe that what percentage of that increase is connected to the appreciation in the value of the farm land?

* * *

THE WITNESS:   The tillable acreage is all - - that is all the value there is there.   The ten acres is what it is that the house and the barn sit on.   The value is in the tillable acreage and it just appreciated because of the economic circumstances.   There's nothing that I did to make the farm

ground worth anymore. Nothing that we did to make the farm ground worth anymore. We didn't tile it. We didn't do anything to it. Just got worth more.

**{¶ 12}** On cross-examination, David testified that the only issue of concern to him is the farm. He stated that income of $6,175.00 from rent was placed into the farm account twice a year, and that the tillable acres were rented for the last ten years.

**{¶ 13}** The Magistrate issued a Decision and Order on July 2, 2014, that provides that the parties had two rental properties on Cross Street and West Weller, and that the Cross Street property had a net marital equity of $17,650.00, and the West Weller property had a net marital equity of $13,168.00. The Magistrate noted that David had no objection to these properties being awarded to Danette. The Magistrate further determined in relevant part as follows:

> \* \* \*

> The marital residence is located on property located at 9887 Beam Road, Ansonia, Ohio, commonly referred to as the farm.

> The Defendant and his three siblings inherited the property, which consists of 107.33 acres, 97 of which are tillable. A house and other farm-related buildings are located on the property. When the property was inherited the real estate was appraised at $225,000. It was appraised at $1,000,000 for purposes of this hearing.

> In early 1996, David and his sister Ann purchased their siblings Ted and Don's interest in the property, paying each of them $115,000 for their share of the real estate and farm equipment. The deed to the property is

in the names of David and Ann. In order to buy out their siblings' interests, Ann and David obtained a mortgage from Greenville Federal in the amount of $160,000. Danette is also obligated on the mortgage. The Plaintiff testified at the hearing that the rest of the purchase price ($70,000) came from other assets David and Ann received from their grandfather's estate. David contends that he and Ann are the sole owners of the farm, and that Danette has no marital interest in it. It is his belief that the cash rent income paid the mortgage and marital money did not pay for any significant expenses. It is also his contention that the increase in the value of the property is due to the increase in value to the tillable acres, not from anything the parties did.

Danette agrees that Ann owns one-half of the property but contends the other half is marital. She bases her belief on the fact that she did work on the property (including helping with farming before the decision was made to cash-rent it), that a large portion of her employment income went into the farm account, and that she agreed to be obligated on the mortgage.

The Magistrate finds both David and Ann inherited a ¼ interest in the property, and that David's original ¼ interest remains his separate property. When the farm was purchased from the siblings, Ann's interest increased to one-half. The Magistrate finds the remaining 1/4th interest to be marital. Danette, therefore, has a 1/8 interest in the property and David has a 3/8 interest.

As indicated above, that marital interest was purchased during the

marriage. Although David contends that the cash rent paid all the expenses, that is not entirely accurate. He uses the cash-rent income and monthly payment[s] from 2010-2012 to support that position, ignoring the earlier years. In 2010-2012 the income was close to the expenses, but did not always cover the whole amount of the mortgage, real estate taxes and insurance. The mortgage has an adjustable interest rate, and the original monthly payment was $1,064. David testified that they did not switch to cash renting until about ten years ago, so the mortgage payments for the first eight or so years had to have come from either the parties' income from their employment or from the proceeds from farming the ground themselves. Further, the parties took out a $25,000 second mortgage on the property to pay personal credit card debt, and that loan was repaid with marital money. As the ¼ interest is found to be marital, the Magistrate finds that the increase in value is also marital subject to division.

The first and second mortgages had balances of $100,950 and $3,458 respectively as of the end of 2012, one month before the Complaint was filed.

The Magistrate finds that there is marital equity in the farm of $150,148 as follows:

```
$1,000,000    Present value
  - 225,000   Original appraisal value
   - 70,000   David and Ann's separate assets used for purchase
    705,000
  - 104,408   First and second mortgages
    600,592
    /4
  $150,148    Marital portion
```

* * *

**{¶ 14}** After dividing the parties' motor vehicles, personal property, bank and retirement accounts, the Magistrate determined as follows:

* * *

8.    The following reflects the division of assets and the amount the Defendant will owe the Plaintiff in order to equalize the awards:

| Plaintiff | | Defendant |
|---|---|---|
| $30,728 | Real Estate | $150,148 |
| 0 | Motor Vehicles | 5,187 |
| 2,205 | Personal Property | 10,745 |
| 1,967 | Bank accounts | 8,610 |
| 34,464 | Retirement accounts | 24,120 |
| 152 | STRS | 0 |
| $69,516 | | $198,810 |

$268,326 Total marital assets / 2 = $134,163 per party

| | |
|---|---|
| $134,163.00 | per party |
| - 69,516.00 | Plaintiff's award |
| $64,647.00 | Amount owed to Plaintiff by Defendant |

**{¶ 15}** On July 15, 2014, Danette filed objections to the Magistrate's decision. Danette objected to the Magistrate's determination as to the marital portion of the farm. She further objected to the Magistrate's determination that David "used $70,000 of 'separate assets' to purchase" a portion of the property. David filed objections to the Magistrate's decision on July 23, 2014.   David objected in relevant part to the Magistrate's determination that any portion of the farm is marital property.   Also on July 23, 2014, an Agreed Judgment Entry was filed which provides in part that the parties

agreed to sell a portion of the tillable acreage of the farm on July 30, 2014.

{¶ 16} On October 9, 2014, Danette filed a memorandum in support of her objections. She asserted that the Magistrate erred in determining the original appraised value that was deducted from the present value of the farm. Danette asserted that the evidence did not support the Magistrate's conclusion that "an additional $70,000.00 of inherited money was used to help purchase the interest of the Defendant's two siblings." She further asserted that the Magistrate erred in finding that the marital portion of the farm "was one-fourth, as opposed to one-half, of the current value." Danette argued as follows:

The Defendant, his sister Anne, his brother Ted, and his brother Don, were each the beneficiaries of an undivided one-fourth interest in real estate from their grandfather's estate. Since the real estate was appraised at $225,000.00 in the estate, the value of what they each inherited was $56,250.00. The Defendant, and his sister Anne, each kept their $56,250.00 in inherited value. However, the two brothers, Ted and Don **sold** their inherited value to the Defendant, his wife the Plaintiff, and his sister Anne, in February, 1996. Ted and Don's combined inherited interest was $112,500.00. That $112,500 interest was not inherited by the Defendant, or his sister Anne, but was **paid for** by the Plaintiff and Defendant, who borrowed the money to pay off Ted and Don. Plaintiff signed personally on a $160,000.00 Note and Mortgage to facilitate this purchase. The Defendant and his sister could not obtain the necessary financing unless the Plaintiff obligated herself on the Note and Mortgage. *

* *

In finding that the **entire** original appraised value should be deducted from the Present value, the Magistrate neglected to consider the fact that one-half of this $225,000.00 sum was paid for by the Plaintiff and Defendant with borrowed monies. The Magistrate's Decision gives the Defendant a $112,500.00 credit for property which he did **not** inherit, but rather, which he and his wife purchased! Since the Defendant and his sister Anne kept their respective inherited interests, the correct calculation would therefore be to deduct their combined inherited portion ($112,500.00) from the Present value ($1,000,000.00), which would leave the marital portion at $887,500. Otherwise, the Plaintiff is deprived of her marital interest in $112,500 worth of real estate which she and the Defendant actually purchased.

{¶ 17} Regarding the source of the $70,000.00 used to purchase Ted's and Don's interests in the real estate, Danette asserts that the "Magistrate herself commented about the fact that there was no evidence showing that this $70,000 'came from the estate.' The Defendant's own attorney agreed that the final account filed in [Ted's] probate estate 'doesn't add up' to show how another $70,000.00 came from the estate to purchase the real estate." Danette asserted as follows:

While the Plaintiff and Defendant did buy out the interests of the Defendant's brothers, Ted and Don, for $115,000.00 each, that sum **included** the purchase of Ted Townsend's farm machinery. * * *. This is further proof that the $70,000.00 difference between the purchase price

amount ($230,000.00) and the parties' mortgage loan ($160,000.00) was not solely attributable to the acquisition of real estate. Nevertheless, that's exactly what the Magistrate (erroneously) did, by giving the Defendant an additional "inherited" credit of $70,000.00.

{¶ 18} Finally, Danette asserted that "the Magistrate erred in finding that only one-fourth of the total present value of the real property was the 'marital portion.'" She asserted that through "the efforts of **both** the Plaintiff and the Defendant, an asset that had a value of $225,000.00 in 1995 was now worth $1,000,000.00." Danette asserted that she "performed physical labor at the farm property throughout the years of her marriage to the Defendant," including planting and harvesting crops, repairs and maintenance, care of livestock, landscaping, and bookkeeping. Danette asserted that her "own earnings and efforts were to a large measure what enabled the property to increase in value, all of which occurred during her marriage to the Defendant." According to Danette, her "paychecks from her employment were used from June 1996 through October, 2012 to make the monthly mortgage payments to Greenville Federal. * * * Over this 16 year period, Plaintiff deposited $225,866.00 from her earnings into the parties 'Farm Account,' from which the mortgage payments, real estate taxes, insurance, and general property expenses were paid." Danette asserted that David's sister "never made any mortgage payments, even though she owned an undivided one-half interest," and that Anne never deposited money into the farm account "from which all the real property expenses were paid."

{¶ 19} Danette further asserted as follows:

Additionally, during the marriage the Plaintiff cashed out her 401k(s)

from two different employers, in order to help pay farm expenses. * * * She would not have voluntarily sacrificed her retirements, if the real property was considered by her husband as being his separate, nonmarital asset. * * * She signed additional Notes and Mortgages over the course of her marriage to the Defendant, secured by this "inherited" property, which she also repaid through her employment earnings. * * * She borrowed monies to pay for a new furnace for the house. * * *

{¶ 20} According to Danette, Anne "had nothing to do with this real property after she inherited her one-fourth interest. The real estate was commingled and used exclusively by Plaintiff and Defendant for nearly 20 years. * * * The loan to buy out Defendants' brother was paid off by Plaintiff and Defendant, from the Plaintiff's employment income."

{¶ 21} Danette concluded as follows:

In summary, using the Magistrate's own formula, and substituting the correct "Original inherited value" as well as omitting the unsubstantiated $70,000.00 payment, the marital equity is as follows:

| | |
|---|---|
| $1,000,000.00 | Present value |
| -$112,500.00 | Original appraisal value |
| $887,500.00 | |
| $104,408.00 | Mortgage |
| $783,092.00 | |
| ÷2 | |
| $391,546.00 | Marital portion |

Through all the years of this marriage, Defendant admits that he never told his wife that she had no interest in this real property. * * * He further admits that he allowed his wife to cash in her retirement accounts,

and use those monies to pay expenses for the subject real property, knowing that his wife expected the farm to generate her retirement income. * * * Clearly, the Defendant did not decide that his wife should have no interest in the real estate until she filed for a divorce, and he first sought out legal advice. Up until that point, both Plaintiff and defendant believed the real property was a shared marital asset, as they had always acted in accordance with that belief.

{¶ 22} On October 29, 2014, "Defendant's Memorandum in Opposition to Plaintiff's Objections to Magistrate's Decision and in Support of Defendant's Objections to Magistrate's Decision" was filed. David asserted that the Magistrate "erred by determining that the balance on the mortgages outstanding at the time of the separation should be deducted from David and Anne's separate property, because the funds which were borrowed and secured by these mortgages were not used to acquire the inherited property." According to David, "a mortgage incurred to secure the payment of a promissory note obtained for the payment of Danette and David's credit cards or for purchase money for rental properties would not impact the fact that the mortgaged property was separate property, and, therefore, balances on these debts were not properly deducted from David's separate share." David asserted that although Anne "signed the mortgages to secure notes for these purchases, she was not obligated for the loans to the extent that the loans were solely for the benefit of David and Danette." David argued that no portion of the balance on the note used to purchase the brothers' share of the farm should be deducted from David and Anne's inherited share of the farm.

{¶ 23} David further argued as follows:

* * *

Danette argues that the $160,000 borrowed was used to purchase the farm. This statement is without merit because David and Anne already owned one half of the farm at $112,500 and they only needed $112,500 to purchase the other half of the farm.

The Magistrate found that both David and Anne inherited a ¼ interest in the property and that David's original ¼ interest remained his separate property. The magistrate further found that when the farm was purchased from the siblings, Anne's interest was increased to one half and that the remaining ¼ was marital. Although in her findings the Magistrate seemed to be referring to the present value of the farm, which would include the appreciation of that farm, it is not clear, because the Magistrate did not engage in any separate analysis involving appreciation.

David asserts that the Magistrate erred by failing to address the issue of the appreciation on the inherited property separately. By lumping the entire farm together, the distinction between the portion of the farm inherited and that which was purchased was blurred, as was the distinction between the portion of the property, which was originally acquired, whether by inheritance or purchase, and the resulting appreciation related to each.

David asserts that the half of the farm that he and Anne inherited, as well as the appreciation attributable to that inheritance in the amount of $387,500.00, is David and Anne's separate property.

**{¶ 24}** David asserted as follows:

A correct assessment of David and Anne's separate property is as follows:

$1,000,000 present value of farm less

$112,500   inherited portion of farm
$387,500   appreciation on inherited portion of farm
$500,000   portion of farm inherited by David and Ann
               which is all non-marital

**{¶ 25}** David asserted as follows regarding the "brother's share of the farm":

A.   David agrees with Danette in her contention that one-half of the farm was inherited and the second half of the farm was purchased.

B.   David does not agree with Danette's assertion that the Magistrate erred in concluding that the $70,000 of inherited funds was used to purchase the brothers' share. To the contrary, David contends that the Magistrate was correct in concluding that the $70,000 was separate property, and, having decided this, erred in failing to determine that the portion of the appreciation attributed to the $70,000 was also separate property.

C.   David also asserts that the Magistrate erred when she failed to consider the passive income from the farm in her analysis.

**{¶ 26}** David asserted as follows:

The Amended Inventory and Appraisal in David's grandfather's estate reported the following assets:

Tangible Personal Property    $61,035
Intangible Personal Property  $168,516
Real Estate               $225,000
                              $445,551

* * *

The assets remaining in the hands of the fiduciary after receipts from crops, interest and payment of outstanding obligations totaled $464,558. * * *

This amount was to be shared between four siblings. * * * One-fourth of $464,558 is $116,140.

David and Anne entered into an agreement with their brothers to buy out their interest in their grandfather's estate, which agreement was dated the 23rd day of January, 1996. * * *

In addition to the $112,500 in real estate referred to above, David and Anne inherited:

½ of $61,035 = $30,517    tangible Personal Property

and

½ of $168,516 = $84,258   intangible Personal Property

As required by their agreement, David and Anne paid their brothers, $115,000 a piece, $230,000 total, for their interest in the house, land and farm equipment. * * *

David and Ann borrowed a total of $160,000 from Greenville Federal to pay their brothers for their interest in the house, land and farm equipment in their grandfather's estate.

The difference between the amount borrowed ($160,000) and the

amount paid to the brothers ($230,000) is $70,000. It is reasonable to infer that the $70,000 difference came from David and Anne's inheritance of intangible personal property, particularly in light of the fact that there was absolutely no testimony or other evidence that would remotely suggest that this amount came from marital funds.

* * *

Danette admitted that the $160,000 borrowed from Greenville Federal was used to pay their brothers for their interest in the estate, not solely for the purchase of their interest in the farm.

The Magistrate was correct when she concluded from the facts stated above that $70,000 of the purchase price was David and Anne's separate property.

The Magistrate erred when she failed to address the issue of the amount of appreciation which occurred as a result of the $70,000 of inherited monies that went into the acquisition of the portion of the farm that was purchased from the brothers.

* * *

The brothers' share of the farm had a total value of $112,500. $70,000 is 62% of $112,500. * * * [B]ecause 62.2% of the purchase price of the brothers' share came from David and Anne's inheritance, 62.2% of the appreciation in the portion of the brother's share of the farm land was also David and Anne's separate property.

62.2% of the appreciation on the farmland purchased from the

brothers is $69,975.   The total separate property of the farmland purchased

from the brothers is $139,975, ($70,000 plus $69,975)[.]

A correct evaluation of the portion of the real estate purchased from

the brothers is as follows:

| | |
|---|---|
| $1,000,000 | present value of farm |
| $112,500 | value of purchased portion of farm |
| <u>$337,500</u> | appreciation on purchased portion of farm |
| $500,000 | portion of farm purchased by David and Anne |
| $70,000 | inheritance used for purchase |
| <u>$69,975</u> | portion of appreciation attributable to $70,000 inheritance |
| $139,975 | portion of farm purchased from brothers which is separate property |
| $500,000 | portion of farm purchased by David Anne |
| <u>$139,975</u> | less David and Anne's separate property |
| $360,025 | portion of farm acquired by purchase plus appreciation |
| <u>$100,950</u> | less balance on original mortgage on farm |
| $259,075 | portion of farm acquired by purchase less balance on original mortgage |
| <u>$129,537</u> | less ½ balance belonging to Anne |
| $129,537 | balance after original mortgage and separate property |
| $3,458 | less balance on mortgage (used for David and Danette's benefit only) |
| $126,079 net | |

**{¶ 27}** David asserted that he "has established his separate property claims for

the inherited portion of the farm," and that the "$70,000 used to acquire a portion of the brother's share was inherited." He asserted that Danette ignores "the fact that passive appreciation attributable to the farm land is separate property." He asserted that Danette did not perform any labor that had a significant impact on the value of the farm. David asserted that there is no factual foundation to support a contention that his "separate property was converted into marital property by title, gift, labor or commingling." David asserted that Danette's monetary contributions to the purchase money mortgage were minimal at best. He asserted that the fact that Danette's name was on the mortgage does not change the mortgaged property from separate property to marital property.

{¶ 28} Regarding Danette's assertion that she would not have invested in the farm if she believed that David would claim it as his separate property, David asserted that she "ignores the fact that none of this property was ever titled in her name," and that making payments on promissory notes that are secured by a mortgage on separate property does not make the separate property marital. David further asserted that Danette's monetary contributions to the purchase money mortgage were minimal. David asserted that the "income from the farm almost always paid the mortgage payments, insurance and taxes," and he asserted that in 2012, he received "cash rent" in the amount of $12,663.00, and that he received $13,633.00 in 2011, and $12,350.00 in 2010. David asserted that the total annual mortgage payment was $10,434, "which is about $2,000 less than the cash rent that was actually received." David asserted that any "monetary contribution that Danette may have made toward the mortgage on the farm pales in comparison to the passive income contribution from the cash rent on the farm and Anne's gift of the use of her portion of the residence."

**{¶ 29}** David asserted that the fact that Danette's name was on the mortgage does not change the mortgaged property from separate property to marital property. According to David, even "if it were true that David and his sister could not obtain the necessary financing for the $160,000 without Danette co-signing the loan, the fact that Danette personally obligated herself on the note and mortgage would be of no consequence, if Danette did not prove that she paid the mortgage payments," since "the act of co-signing a loan is not 'labor, money or in-kind contribution.'"

**{¶ 30}** On November 20, 2014, David filed a "Motion for Leave to Present additional Evidence; Affidavit," in which he asserted that "there is evidence that the farm was sold for an amount less than anticipated in the appraisal and that there were unexpected settlement costs and charges." David's attached affidavit provides:

> \* \* \*
>
> 5. By agreement of the parties they sold approximately 99 acres of farm land at public auction on July 30, 2014. The sale price was $826,000.
>
> 6. Defendant and his sister are retaining the marital residence and 9 acres for personal use.
>
> 7. The Defendant and his sister were charged $55,000 in settlement costs on this sale which information was not available at the time of the final hearing.
>
> 8. The Magistrate entered her decision based on the belief that the farm would be sold for $10,000 per acre.
>
> 9. In addition to the above, Greenville Federal Bank required payment of $23,675 toward the mortgages on the rental properties in order

for that financial institution to release the farm as security on those obligations.

10. Since [the] final hearing Plaintiff has failed to pay mortgage payment on the rental properties in a timely manner.

11. The Magistrate's Decision gives Plaintiff the rental properties but does not require her to hold Defendant harmless on the related liabilities.

{¶ 31} Danette opposed David's motion, attaching an affidavit and arguing in part that David failed to contest the appraisal of the farm, and that she did not agree to sell 99 acres of the property, nor agree to the sale price. She asserted that even if the court ordered the property sold to pay off her equity, "the vast majority of the sale proceeds was received by my husband and his sister, and I should therefore not be liable for all of the settlement costs that they incurred in connection with such sale."

{¶ 32} On November 21, 2014, the court issued a "Notice of Intent," by means of which it provided "notice of its intent to modify the Magistrate's Decision and to use actual value and to consider other facts." The court ordered the parties to submit a copy of the settlement sheets from the real estate sale, "including itemization of all costs / deductions," an appraisal for the nine acres and building kept by David and his sister, and proof of payment of $23,675.00 "toward mortgage payments, including all supporting documentation of the amount and demand for such payments." In two separate notices of compliance, David submitted a settlement statement from the sale of the farm and proof of payment of $23,675.00 "toward mortgage payments," as well as records of payments on the rental properties. David advised that no "additional evidence on the

value of the nine acres is being offered."

**{¶ 33}** On December 23, 2014 Danette responded to the court's Notice of Intent, arguing that there "are several reasons why the Plaintiff should not be held responsible for any portion of the settlement costs incurred by the Defendant and his sister in connection with the sale of a portion of their real property."

**{¶ 34}** On January 5, 2015, the court issued a "Judgment Entry – Overruling Objections and Granting Decree of Divorce."   The court found in relevant part as follows:

Preliminarily, the Court notes that the Defendant filed a motion for leave to present additional evidence on November 20, 2014.   The Court has reviewed the additional pleadings which it requested by Notice on November 21, 2014.   While the Court would prefer to adjudicate the merits of the property settlement on actual sales prices and pay-off balances, too many issues would remain if the Court was able to use the submitted data. Since the case has been pending beyond recommended guidelines, and since further litigation by the Magistrate would appear to be a "second bite at the apple," the interests of closure must be served.   Therefore, the motion to present additional evidence is overruled.

Regarding the objections to the Magistrate's Decision filed by both the Plaintiff and the Defendant, the Court has considered the objections filed by the opposing party (sic).   These objections concern various issues of property division and spousal support.   An independent review of the transcripts and exhibits has been conducted by the Court.

While each party's arguments may be supported by their individual

interpretations of the facts, the inferences and conclusions to be drawn therefrom are not necessarily the sole and exclusive ones. Upon review of the pleadings, the Court finds that the Magistrate's decision is supported by competent and credible evidence. The Court concurs with the findings of facts and conclusions of law made by the Magistrate. The Magistrate's decision dated July 2, 2014 is adopted by the Court.

* * *

{¶ 35} Danette filed a Notice of Appeal on February 2, 2015. On March 26, 2015, the court issued a Judgment Entry/ Decree of Divorce, noting that its January 5, 2015 Judgment Entry was not a final appealable order, and ordering that "this Judgment Entry/Decree of Divorce be entered Nunc Pro Tunc as of January 5, 2015." Since the trial court lacked jurisdiction at the time the nunc pro tunc order was issued, due to Danette's pending appeal, a second divorce decree was issued on July 30, 2015. Therein the trial court determined as follows:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Plaintiff shall be awarded the properties located on Weller and Cross Street, and she shall be responsible for the mortgages thereon. She shall make every effort to refinance the mortgages, removing the Defendant from liability thereon within six months.

* * *

5. The request for spousal support shall be overruled, and the Court shall not retain jurisdiction of the issue.

6. The Defendant shall be awarded his separate 1/4 interest in the farm, as well as the marital 1/4 interest, and he shall be responsible for the debt thereon.

7. The following reflects the division of assets and the amount the Defendant will owe the Plaintiff in order to equalize the awards.

| Plaintiff | | Defendant |
|---|---|---|
| $30,728 | Real Estate | $150,148 |
| $-0- | Motor vehicles | $5,187 |
| $2,205 | Personal property | $10,745 |
| $1,967 | Bank Accounts | $8,610 |
| $34,464 | Retirement [acts.] | $24,120 |
| $152 | STRS | $ -0- |
| $69,516 | | $198,810 |

$268,326 Total marital assets /2 = $134,163.00 per party

$134,163.00 Per party
$-69,516    Plaintiff's award
$64,647.00   Amount owed to Plaintiff by Defendant

8. If it is necessary to sell all or part of the farm to make the above payment, the parties shall each be responsible for 1/2 of any capital gains taxes related to the amounts owed to the Plaintiff.

{¶ 36} Danette asserts two assignments of error herein which we will consider together. They are as follows:

THE TRIAL COURT ERRED IN ITS DETERMINATION AS TO THE MARITAL VALUE OF THE PARTIES' REAL PROPERTY CONSISTING OF 107.33 ACRES AT 9877 BEAM ROAD, ANSONIA, OHIO.

And,

THE TRIAL COURT ERRED IN FINDING THAT THE APPELLEE USED $70,000.00 OF "SEPARATE ASSETS" TO PURCHASE THE REAL

PROPERTY ACQUIRED BY THE PARTIES DURING THEIR MARRIAGE.

**{¶ 37}** As this Court has recently noted:

Appellate courts review a trial court's division of property under an abuse of discretion standard, but a trial court's classification of property as marital or separate must be supported by the manifest weight of the evidence. *Mays v. Mays*, 2d Dist. Miami No. 2000–CA–54, 2001–Ohio–1450. When we consider manifest weight arguments, we "review the evidence, and * * * determine whether, when appropriate deference is given to the factual conclusion of the trial court, the evidence persuades us by the requisite burden of proof." *Cooper v. Cooper*, 2d Dist. Greene Nos.2007–CA–76 and 2007–CA–77, 2008–Ohio–4731, at ¶ 25; *Howard v. Howard*, Montgomery App. No. 16542, 1998 WL 127526 (Mar. 20, 1998). As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be

persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

"Oral testimony as evidence, without corroboration, may or may not satisfy the burden." *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005–Ohio–1368, at ¶ 23 (2d Dist.), citing *Fisher v. Fisher*, 2d Dist. Montgomery No. 20398, 2004–Ohio–7255. "Because traceability presents a question of fact, we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent credible evidence." *Id.*

Generally, the party claiming that an asset is separate property has the burden of proving the claim by a preponderance of the evidence. *Peck v. Peck*, 96 Ohio App.3d 731, 734, 645 N.E.2d 1300 (1994). * * * Because of the presumption that property acquired during marriage is marital property, R.C. 3105.171(3)(a)(i), this presumption can be overcome only with clear and convincing evidence. *Barkley v. Barkley*, 119 Ohio App.3d 155, 168, 694 N.E.2d 989 (1997). Clear and convincing evidence means that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Id.*

*Hall v. Hall*, 2d Dist. Greene No. 2013 CA 15, 2013-Ohio-3758, ¶12-14.

**{¶ 38}** R.C. 3105.171 governs the division of marital property and separate property and provides:

\* \* \*

(A)(3)(a) "Marital property" means, subject to division (A)(3)(b) of this section, all of the following:

(i) All real and personal property that currently is owned by either or both of the spouses, including but not limited to, the retirement benefits of the spouses, that was acquired by either or both of the spouses during the marriage;

(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both spouses that occurred during the marriage;

\* \* \*

(b) "Marital property" does not include any separate property.

(4) "Passive income" means income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse.

\* \* \*

(6)(a) "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:

(i) An inheritance by one spouse by bequest, devise, or descent

during the course of the marriage;

> (ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

> (iii) Passive income and appreciation acquired from separate property by one spouse during the marriage;

> * * *

> (b) The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.

**{¶ 39}** As this Court recently noted:

> * * *"Traceable" here "refers to evidence demonstrating a connection between property currently owned and some antecedent article of separate property. Such proof overcomes the effect of commingling, by which separate property may be 'transmuted' into marital property." *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 22 (2d Dist.). So in determining whether property is separate or marital, "[t]he key issue is traceability." *Janis v. Janis*, 2d Dist. Montgomery No. 23898, 2011-Ohio-3731, ¶ 48.

*Urbanic v. Urbanic,* 2d Dist. Montgomery No. 26309, 2015-Ohio-1402, ¶ 5.

**{¶ 40}** We will initially address the trial court's classification of the $70,000.00 at issue as David's separate property. Danette asserts that there "was **no evidence** presented to support the Trial Court's finding that the Appellee, and his sister Anne, used $70,000.00 of additional inherited monies to purchase real estate from their brothers, Ted

and Don." She asserts that the "Magistrate herself commented about the fact that there was no evidence showing that this $70,000.00 'came from the estate.' " Danette asserts that the $115,000.00 that was paid to Ted and Don "**included** the purchase of Ted Townsend's farm machinery. * * * This is further proof that the $70,000.00 difference between the purchase price amount ($230,000.00) and the parties' mortgage loan ($160,000.00) was not solely attributable to the acquisition real estate." David responds that the trial court "reasonably inferred that the $70,000 difference came from Appellee and his sister's inheritance of intangible personal property * * * ."

{¶ 41} We note that while Danette denied, in Admission #44, that the "remaining $70,000 that was paid to Don and Ted to satisfy their obligations under the terms and conditions of their agreement came from monies that Defendant and Anne received as their inheritance from the estate," she subsequently agreed on cross-examination that Anne and David got money from their grandfather's estate in the form of CDs, which they cashed in to pay the difference between the amount mortgaged and the amount owed. David testified that he and his sister "put inherited funds towards what we ended up settling up with my brothers for because 160 wasn't going to get it." There is no suggestion that the $70,000.00 came from a source other than Ted Townsend's estate. We conclude that the trial court's classification of the $70,000.00 as David's (and Anne's) separate property is supported by the manifest weight of the evidence. Danette's second assigned error is accordingly overruled.

{¶ 42} Regarding her first assigned error, Danette asserts that she "did not receive her rightful interest in the marital portion of said real property, because of two errors made by the trial court. First, an error was made in the Trial Court's

[d]etermination as to the 'original appraised value' that the Trial Court then deducted from the present value. In addition, the Trial Court erred in finding that the 'marital portion' of this real property was one-fourth" of the current value.

{¶ 43} Danette asserts that in "finding that the **entire** original appraised value should be deducted from the Present value, the Trial Court neglected to consider the fact that one-half of this $225,000.00 sum was paid for by the Appellant and Appellee with borrowed monies." According to Danette, the trial court's decision "gives the Appellee a $112,500.00 credit for property which he did **not** inherit, but rather, which he and his wife purchased." She asserts that through "the efforts of **both** the Appellant and the Appellee, an asset that had a value of $225,000.00 in 1995 was now worth $1,000,000.00." Danette asserts that her "own paychecks from her employment were used from June, 1996 through October, 2012 to make the monthly mortgage payments to Greenville Federal," totaling $225,866.00. In addition, Danette asserts that she "would not have sacrificed her retirements, if the real property was considered by her husband as being his separate, nonmarital asset." According to Danette, the "real estate was commingled and used exclusively by Appellant and Appellee for nearly 20 years," and David "never told his wife that she had no interest in this real property." Danette again asserts that the marital portion of the property has a value of $391,546.00.

{¶ 44} David responds that "the portion of real estate acquired using separate property is separate property," and that "there is no factual foundation to support a contention that [his] separate property was converted into marital property." He asserts that "mortgaging separate property to acquire other property does not make the separate property marital," and that "the fact that [Danette's] name is on the mortgage does not

change the mortgaged property from separate property to marital property." David asserts that "to the extent that mortgage payments are made from income from separate property, the portion of the property acquired using that separate income is separate property."

{¶ 45} David asserts that by "lumping the entire farm together, the distinction between the portion of the farm inherited and that which was purchased was blurred, as was the distinction between the portion of the property, which was originally acquired, whether by inheritance or purchase, and the resulting appreciation related to each." David asserts that the trial court "failed to consider the appreciation of the farm land as a separate issue at all," and that such a failure is an abuse of discretion.

{¶ 46} We initially note that David did not file a cross-appeal, and we accordingly will not address his argument that the trial court conducted an incorrect "analysis of the nature of the 107.33 acres as separate vs. marital property." Having determined above that David established that the $70,000.00 was separate property, we further find that an abuse of discretion is not demonstrated in the trial court's division of the farm. The court correctly concluded that David and Anne each inherited a one-quarter interest in the farm, and that David's original, traceable one-quarter interest remained his separate property. After David and Anne purchased the other half of the property from their siblings, Anne's total interest in the farm increased to one half, as the trial court correctly found. We further agree with the trial court that the remaining one-quarter interest that David and Danette purchased is marital property, and that the increase in value thereof is also marital property. We note that Danette had the benefit of residing at the farm during her marriage.

{¶ 47} Finally, we find that the trial court correctly determined that the marital

portion of the farm is $150,148.00. The court deducted the value of the farm when it was inherited, $225,000.00, from the present value of $1,000,000.00, thereby accounting for the increase in value of the farm. It further accounted for David's and Anne's separate assets used to purchase their siblings' interests by deducting the $70,000.00 from the present value of the farm. From the remaining sum of $705,000.00, the court deducted the value of the first and second mortgages, $104,408.00, leaving a sum of $600,592.00. One-quarter interest therein is David and Danette's marital property, purchased by them during their marriage, namely $150,148.00. Since an abuse of discretion is not demonstrated, Danette's first assignment of error is overruled.

{¶ 48} Having overruled Danette's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Scott D. Rudnick
Linda Stemmer
Hon. Jonathan P. Hein